# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Gumila*, **2012 IL App (2d) 110761**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNOR GUMILA, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0761 |
| Filed | December 6, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for possession of child pornography was upheld over his contentions that the evidence of the Internet browsing history for his computer showing a history of visits to sites with names suggestive of child pornography constituted improper other-acts evidence and that the evidence was insufficient to establish that he knowingly and voluntarily possessed the images found on his computer, since the browsing history suggested defendant sought out and intended to visit sites with names suggestive of child pornography and the relevance of that evidence outweighed any unfair prejudice. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 07-CF-2980; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on        Jennifer B. Hulvat, of Hulvat Law Firm, of Oak Brook, for appellant.
Appeal

                  Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M.
                  Bauer and Marshall M. Stevens, both of State's Attorneys Appellate
                  Prosecutor's Office, of counsel), for the People.


Panel             JUSTICE BIRKETT delivered the judgment of the court, with opinion.
                  Justices Burke and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a bench trial, defendant, Vernor Gumila, was convicted of possession of child pornography (720 ILCS 5/11-20.1(a)(6) (West 2008)). The physical evidence at trial consisted of (1) several photographic images forensically extracted from defendant's computer, which images defendant did not dispute constituted child pornography; and (2) the Internet browsing history for defendant's computer, which showed a history of visiting Web sites with names suggestive of child pornography. Defendant argues that the latter was improper other-acts evidence. He also argues that the evidence was insufficient to show that he knowingly and voluntarily possessed the images discovered on his computer. We reject both contentions and affirm.

¶ 2                                    I. BACKGROUND

¶ 3        On October 10, 2007, after the police executed a search warrant at the residence of Shawn Bowlden and seized items in his possession that constituted child pornography, the police asked defendant, Bowlden's roommate, for consent to search his camera and computer. Defendant gave consent, and a forensic analysis of the computer's hard drive revealed 13 photographic images that investigators and prosecutors determined were child pornography. Defendant was charged with 13 counts of child pornography under section 11-20.1(a)(6) of the Criminal Code of 1961 (Code) (720 ILCS 5/11-20.1(a)(6) (West 2008)), one count for each image.

¶ 4        At defendant's bench trial, the State called several police officers as well as Bowlden. St. Charles police officer Troy Peacock testified that, on October 10, 2007, he helped execute a search warrant at 929 Third Street in St. Charles. The subject of the warrant was Bowlden, who was present with defendant. Peacock informed defendant that the police were there because Bowlden was suspected of possessing child pornography. The police seized numerous items of pornography from Bowlden's bedroom and arrested him. About two

hours later, Peacock returned to the residence with St. Charles police detective Christie Fry.[1] Peacock had been informed that defendant, too, was suspected of possessing child pornography. Peacock and Fry spoke to defendant and asked for consent to take and search his camera and computer. Defendant signed a consent form, and Peacock and Fry took defendant's camera and computer from his bedroom.

¶ 5    Bowlden testified that the October 2007 search of his bedroom led to child pornography charges against him. He pled guilty to the charges and was sentenced to probation, which he was still serving at the time of his testimony. In October 2007, Bowlden and defendant both were gymnastics instructors. They roomed together at 929 South Third Street in St. Charles. Each had his own bedroom and his own computer that he kept there. In October 2007, Bowlden was addicted to pornography, including child pornography, and used his computer to view images of pornography on the Internet. Bowlden testified that defendant kept his bedroom unlocked and had no password protection for his computer. Occasionally, Bowlden would take his computer into defendant's bedroom to use his modem for Internet access. Bowlden, however, never used defendant's computer.

¶ 6    Fry and St. Charles deputy police chief Steven Huffman described the events following defendant's relinquishment of his camera and computer. Huffman testified that defendant's computer was forensically examined by investigators on the afternoon of October 10. Later that afternoon, the examiners told Huffman that 13 images of child pornography were recovered from the computer's hard drive. That evening, Huffman and Fry went to defendant's place of work, a gymnastics studio, and arrested him for possession of child pornography. At the police station, defendant executed a *Miranda* waiver, following which Huffman and Fry had a discussion with defendant that fell into two stages. The first was an unrecorded discussion, or "pre-interview," the second an audiotaped statement.

¶ 7    According to Huffman, the unrecorded discussion spanned 30 to 45 minutes. Fry testified to the specifics of the discussion:

"Q. Do you remember what the Defendant told you during that conversation?

A. Yes, I do.

Q. Can you briefly summarize it?

A. He basically–he told me that he was Shawn Bowlden's roommate at 929 South Third Street since about October 2006, and that he was pretty sure that Shawn Bowlden had not used his computer ever.

***

Q. And what did you ask him or what did he tell you about his own computer usage?

A. He said that on a daily basis he would go onto the Internet to look at pornography, and for about seven years he said he had been doing that, looking at adult pornography on his computer, and for about the past five years he had been looking at child pornography on his computer.

Q. Did you ask him, as it relates to the child pornography, and what sorts of images

---

[1]Fry is also referred to as Christine Widlarz in the record and briefs.

he was looking for?

A. He said that–I asked him if he was aware that the images he was looking at were children under the age of 17, and he said that he was. And when I asked him how he could tell that they were under the age of 17, he said because of their lack of physical development.

Q. Did you ask him whether or not he was looking for any particular age group depicted in the images?

A. I asked him what age group he was interested in, and he told me that it was between 13 and 15 because they were just starting to develop.

Q. Did he tell you how he went about accessing or looking at these images?

A. He went–he said that he went to adult and child pornography websites, and then he would click on whatever image was interesting to him.

Q. Did he ever say if he would return to these websites?

A. He said he would often return to the websites that he was interested in to revisit the same pictures that he liked.

Q. At the conclusion of your conversation with him, did he say anything about how he felt about looking at these images?

A. I asked him if he knew that looking at child abuse images under–you know, child pornography images, which is kids under the age of 17[,] was illegal, and he said he did know it was illegal and that it was wrong, and we did ask him if he wanted help with that problem, and he did state yes."

¶ 8   Huffman was asked if either he or Fry "indicated to [defendant in the pre-interview] that the computer sometimes stores stuff automatically." Huffman answered, "We may have. I don't recall."

¶ 9   As for the recorded statement, both Fry and Huffman asked questions, but Huffman was the principal questioner. Both the recording and a transcript were admitted into evidence. The recording was played for the trial court but is not in the appellate record. In the transcript, defendant is first asked about his livelihood. He states that he has been a gymnastics instructor for about 15 years. He used to coach boys but now coaches only girls. His students range from age 7 to 18. The questions then turn to defendant's usage of his home computer, and he makes the following material statements:

(1) Defendant "start[ed] browsing for adult pornography" when he acquired his computer about five to seven years ago.

(2) "[E]veryday [*sic*]" at his home, defendant would "look at pornographic materials on [his] computer through the [I]nternet."

(3) "[P]robably everyday [*sic*]" at his home, defendant would "brows[e] *** for *** pornographic images or brows[e] for porn on the [I]nternet."

(4) Asked when he "start[e]d looking at *** pornographic images of of [*sic*] girls under the age of 17," defendant answers that he "[p]robably started running into that stuff right away."

(5) Defendant would "come across images of *** children or girls that [he] kn[e]w to be under the age of 17," and even as young as 12.

(6) "[T]hese images were of naked girls under 17."

(7) Defendant "clearly knew by there [*sic*] appearance that they were under the age of 17."

(8) "When [defendant was] looking at images of girls [he] knew to be *** younger than 17," and as young as "12 & 13," he knew this was "illegal" and "wrong."

(9) Defendant does not "look for the web sites *** specifically for children under 17."

(10) Rather, he would "come across these images" by "looking at pictures," and he would "click[ ] on" the images to open and view them.[2]

(11) Defendant never "save[d] the images on [the] hard drive on [his] computer," but "assum[ed] that the computer does that on [its] own."

(12) Defendant would "go[ ] back and look[ ] at the same images more than once," because "you run through certain web sites [that] will have the same pictures on [them] over and over again."

(13) Defendant would not "specifically go to that web site to view that image again," but the image "may *** pop up again."

(14) Asked "how many times a week would [he] look at *** pornographic images of children under the age of 17," he replies, "As long as I run across them[,] so I guess everyday [*sic*]."

(15) Defendant has never printed or e-mailed any of the images he views on the Internet.

(16) He has never "paid *** money for a subscription to any *** pornographic web sites, adult or child."

(17) Defendant has "[p]robably less than 100" "pornographic images of girls under the age of 17 *** on [his] hard drive."

(18) Defendant has never shared these images on his hard drive with anyone.

(19) Defendant uses America Online (AOL) accounts nal71 and vmyster120.

---

[2]The specific exchange was:

"[Officer]: When you browse on the [I]nternet for these *** images ***[,] explain to me how that [*sic*] do you look for the web sites *** specifically for children under 17?
[Defendant]: No.
[Officer]: Explain to me how you would come across these images.
[Defendant]: Umm basically I'm I'm [*sic*] looking at pictures. Not really looking at text or anything, just pictures.
[Officer]: O.K. But you click on the images?
[Defendant]: Yes.
[Officer]: To open and to view them?
[Defendant]: Yes."

In what follows, we occasionally refer to portions of the recorded statement by the above numbers.

¶ 10    Huffman testified that the subject of the recorded statement then turned to a young girl named Shelby, pictures of whom were found on defendant's hard drive. Defendant described the photos to Huffman as showing Shelby in a bathing suit at the dunes in Michigan in 2005. Defendant remarked that "*we* make a trip there every year" (emphasis added). (Defendant was not asked to explain what he meant by "we.") Defendant believed that Shelby was 14 years old when he took the photos. Defendant took the photos because he was looking "for sexy poses to use for a collage." Defendant has made "sexy collages" of other "kids." The photos are not for his "personal use," though he keeps copies of them. Defendant claimed that Shelby's parents were aware of the photos and that he gave them a disk containing them.

¶ 11    In his testimony, Huffman described the photos of Shelby. One photo showed her "on her hands and knees with her butt extended towards the camera, with her looking back at the camera." There were other photos of her "bending over for the camera in a provocative way." Huffman testified that, after the State's Attorney's office reviewed the photos, it determined that they were not illegal.

¶ 12    Both Huffman and Fry testified regarding the content of, and relationship between, the recorded and unrecorded statements. As to the content of the recorded statement, Huffman acknowledged that the phrase "come across," which appears in remarks (5) and (10), was his phrase, not defendant's. Huffman agreed that the phrase "basically means that you can be looking for things that are legal to look at and you might see something that's illegal in the course of that." Regarding remarks (12) and (13), Huffman agreed that to view a "pop up" image is "different from saving an image or knowing an image is on your hard drive and going back and relocating that image over and over again." By "pop up," Huffman took defendant to mean that "the picture was more of a random kind of thing, that he would come across pictures and he would recognize them as being something he had seen before." Huffman recognized that, when defendant was asked (to use defense counsel's paraphrase) "how often he would look at or see images of child pornography or of people under the age of 17," defendant "basically" said, "[O]nly whenever I run across it," and he "never told [Huffman] [that] he was out there looking for it."

¶ 13    Huffman testified that in taking the recorded statement it was important to ask defendant to reaffirm "certain things" that he said in the unrecorded statement. Huffman believed that "all things that were important in terms of [his] investigation are contained in the [recorded statement]."

¶ 14    Huffman admitted that he never confronted defendant with the photos of child pornography that were taken from his hard drive, even though they were available on the night of October 10, 2007, during the recorded and unrecorded statements. Huffman also admitted that he never asked defendant if he found images of child pornography sexually gratifying, though this would have been a "relevant consideration" in the investigation.

¶ 15    Fry also testified to the content of the two statements. Fry stated that the aim of engaging a suspect in an unrecorded discussion before taking any recorded statement is to "[m]ake sure that [the suspect has] his story straight and [that] he doesn't go back and forth." She

acknowledged, however, that the following remarks were in defendant's unrecorded statement but not in his recorded statement: (A) he has been looking at child pornography on the Internet for the past five years; (B) he would often return to Web sites to view the same images; (C) he was attracted to children between the ages of 13 and 15 because they were just starting to develop; and (D) he could tell from their lack of development that children were under the age of 17. Fry agreed that item (C) would have been "a critical piece of information" to include in the recorded statement. (She was not asked about the importance of items (A), (B), and (D).) Fry acknowledged that she was present during the recorded statement and could have asked questions on any points that she believed should have been addressed. Asked why she did not ask defendant to reconfirm points (A) through (D), Fry explained that suspects speak more freely when they know that they are not being recorded. For example, in the recorded statement, defendant's answers were "shorter" and he eventually became defensive and less cooperative. Fry was then asked why the police would ever record an interview with a suspect. She answered, "You have to ask [Huffman] about that. That's protocol."

¶ 16        As to police interrogations generally, Fry acknowledged that one police interview tactic is to initially "minimize" the conduct under investigation and to "soften it up a little bit so the suspect might think that they're less culpable." Fry denied, however, that the goal of an interrogation is to obtain a confession rather than to find the truth.

¶ 17        The State's final witness was Du Page County sheriff's deputy David Sand, who testified as an expert in computer forensic examination. Sand stated that the St. Charles police had asked him to examine the hard drive of defendant's computer. Sand recovered from the hard drive 13 files, each of which contained a single image of what Sand ascertained was child pornography. Sand recovered nine files from the allocated space within the hard drive and four files from the unallocated space.

¶ 18        Sand explained that the allocated space within a hard drive contains files that are accessible to the user through a computer's file-browsing utility, such as Windows Explorer. Every file in allocated space contains data that tells the name of the file, the date it was created, and the file path describing where the file is situated on the hard drive. The unallocated space of a hard drive is space "where there is not a specific file that is available for use by the operating system." Files in allocated space remain there until deleted, at which point they are transferred to unallocated space. Sand explained that unallocated space is not reserved for any particular file; it consists of space that contains no data at all as well as space occupied by data from deleted files. Unallocated space is automatically overwritten as the computer needs more allocated space. Sand testified that once a file in allocated space is deleted and transferred to unallocated space, it can no longer be located with a standard file-browsing utility; rather, specialized recovery software is needed. Since data in unallocated space might be overwritten at any time as the need arises, a file in unallocated space can be partially or wholly unrecoverable. Files that exist in unallocated space are known as "lost" or "orphan" files. A lost file can still retain its name, creation date, and file path.

¶ 19        Sand testified that, using specialized recovery software, he recovered from the unallocated space of defendant's hard drive four lost files, each containing an image of child

pornography. Each had a creation date of January 14, 2007. Sand testified that he did not, nor was he asked to, examine whether defendant's computer had specialized software for the recovery of lost files.

¶ 20     Sand further testified that all nine files that he recovered from the allocated space within defendant's hard drive were contained in a folder reserved for temporary internet files (TIFs). Sand explained that, when a user visits a Web page that displays an image or text, the functions available to the user include (1) saving that image or text to the location of the user's choice on the computer's hard drive; (2) saving it to external media, such as a CD ROM; (3) printing it; or (4) e-mailing it to others. In addition to the copy that a user can make on his own initiative, the computer automatically stores a copy of the image or text as a TIF. No user action is necessary for the creation of a TIF. The folder where TIFs are kept is also known as the "web cache." Sand explained that the storage of images or text from a previously viewed Web page enables the computer to load the page more quickly when it is revisited. Also, TIFs permit the user to view Web site images or text without having to access the Internet. The user can locate the TIF folder or web cache with a standard file-browsing utility, like Windows Explorer. Sand explained that, once the user locates the desired file within the TIF folder, he can perform any of the functions he could have performed when the file was first loaded on the computer screen (*e.g.*, save to another location, print, or e-mail). The nine TIFs of child pornography that Sand recovered had creation dates ranging from July 9, 2006, to October 10, 2007 (the single TIF from October 10, 2007, the date that defendant was arrested, had a creation time of 9:58 a.m.).

¶ 21     Sand admitted on cross-examination that he was unable to ascertain who was using defendant's computer when the 13 pornographic images were stored on the hard drive.

¶ 22     All 13 files recovered from defendant's computer were admitted into evidence with no defense objection. The defense did object, however, to evidence of the Internet browsing history on defendant's computer. This history consisted of "Favorites" and "Cookies."

¶ 23     Sand explained that he recovered "Favorites" from the AOL accounts nal71 and vmyster120, both of which defendant, in his recorded statement, admitted using. Sand explained that the Favorites option on Internet-browsing software permits the user to save the addresses of preferred Web sites. When the user wishes to visit one of those sites, he need only click on the Favorites tab designated for that site, and the browser will go directly there. Thus, the Favorite acts as an Internet shortcut, eliminating the need for the user to search for the Web site again or type its name into the browser's address bar. Sand testified that, when he reviewed the Favorites in defendant's AOL accounts, he saw Web sites with names containing "terms or words that are associated with child pornography or a sexual interest in children," such as "Lolita" and "preteen."

¶ 24     Some of the Favorites admitted into evidence are in the form of Web addresses such as "LittleVirginz.com." Others are titles or descriptors such as "Petite Teen Girls," "Teen Naked Chicks, Teen Hot Sex," and "Welcome to Teen Cam Girls Site." Sand acknowledged that he did not attempt to link the Favorites in defendant's AOL accounts to the 13 pornographic images recovered from defendant's hard drive. Sand also admitted that, though the Favorites were associated with defendant's AOL accounts, Sand could not determine for

certain who was accessing an account when any given Favorite was created.

¶ 25    Sand further explained that a "Cookie" consists of data that a Web site sends through its server to the browsing computer, where the data is stored in the TIF folder. Cookies are saved automatically, without any action by the user. Web sites use Cookies to gather information about the browsing history of the computer. Moreover, the Cookie itself contains information, such as the date it was created, the Web site that created it, and the number of times the site was visited by that computer. Sand recovered from defendant's TIF folder numerous Cookies from Web sites with names containing terms that, in Sand's experience, are associated with child pornography. Sand identified "preteen" and "Lolita" as examples of such terms.

¶ 26    The Cookies found by Sand recorded the number of times that defendant's computer visited the sites that originally sent the Cookies. Some of the more frequently visited sites were preteen.newpussypics.com (visited 24 times), lolitalovers.net (35 times), sexyschoolgirls.net (55 times), and lolitadolls.info (85 times). Another Cookie was associated with the site lolitampegs.com/st/, which was visited 31 times. Sand explained that an "mpeg" is a video file.

¶ 27    Unlike the Favorites, which were associated with defendant's AOL accounts, the Cookies were associated only with defendant's computer, and Sand admitted that he could not determine who was using the computer either when a particular Cookie was created or when a Web site that had left a Cookie was revisited. Also, as with the Favorites, Sand did not attempt to link the Cookies with any of the 13 images recovered from defendant's computer.

¶ 28    Based on this absence of linkage, defendant argued that the Cookies and Favorites were irrelevant and inadmissible. The trial court overruled the objection and admitted the Cookies and Favorites. The court found, without elaboration, that the evidence was relevant.

¶ 29    At the close of the State's evidence, the defense moved for a directed finding on the ground that the State had failed to prove that defendant knowingly possessed any of the images. In opposing that motion, the State argued that defendant's Cookies and Favorites, associated as they were with Web sites of child pornography, indicated that he was "the type of individual who is out there seeking this type of material" and, therefore, that the presence of child pornography on his hard drive was not fortuitous. The trial court denied the motion for a directed finding. Later, the State incorporated into its closing argument the remarks it had made in opposing the motion for a directed finding.

¶ 30    The trial court found defendant guilty on the counts corresponding to the nine TIF images, but found him not guilty on the counts corresponding to the four lost files. The court discussed extensively two recent cases on section 11-20.1(a)(6) of the Code: *People v. Josephitis*, 394 Ill. App. 3d 293 (2009), and *People v. Scolaro*, 391 Ill. App. 3d 671 (2009). The court found both cases "on all fours [with] the case at bar." Citing the definition of "possession" in the case law and the definition of "voluntary" possession in section 11-20.1(b)(5) of the Code (720 ILCS 5/11-20.1(b)(5) (West 2008)), the court said:

"The Court has viewed the [C]ookies and the Court has viewed the web pages for which the Defendant reached out, and they are replete with websites of child pornography.

The Court has seen the images that were brought up on Defendant's computer, and

the Court has listened carefully to the Defendant's confession that he did have child pornography.

The Court finds that in the [TIF] folders, Counts 4, 6, 7, 8, 9, 10, 11, 12, 13, there was an ability to retrieve those for viewing, but on Counts 1, 2, 3, and 5, those are lost files and that same ability was not present."

¶ 31     Defendant filed this timely appeal.

¶ 32                                    II. ANALYSIS

¶ 33     Defendant's two arguments on appeal are, first, that the Cookies and Favorites were improper propensity evidence and, second, that the State failed to prove that he knowingly and voluntarily possessed child pornography under sections 11-20.1(a)(6) and (b)(5) of the Code. There are two important evidentiary points that defendant does not dispute: first, that the nine photographic images for which he was convicted were child pornography as defined by section 11-20.1(a)(6), and, second, that the Cookies and Favorites were associated with Web sites depicting child pornography.

¶ 34                       A. Admission of Cookies and Favorites

¶ 35     We first address defendant's claim that the trial court erred by admitting evidence of the Cookies and Favorites found on his hard drive. Defendant argues that, because the State never established that the images of child pornography on his hard drive originated from the Web sites connected with the Cookies and Favorites, the sole purpose of the evidence was to show that defendant was disposed to seeking Web sites of child pornography. We disagree.

¶ 36     Our analysis begins with a matter of procedure. Defendant admits that he did not preserve this argument for appeal, because, while he raised it at trial, he did not reassert it in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal, defendant must both object at trial and raise the issue in a posttrial motion). He urges us to reach the argument under the plain-error doctrine, which bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Plain-error review is permitted when:

"(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

"The initial step in conducting plain-error analysis is to determine whether error occurred at

all." *People v. Walker*, 232 Ill. 2d 113, 124 (2009). This requires a substantive review of the issue. *Id.* at 125. Reaching the substance of defendant's argument, we hold that the admission of the Cookies and Favorites was not error.

¶ 37        The common-law rule is that evidence of crimes, wrongs, or acts by the defendant aside from the crime(s) for which he is being tried is inadmissible if the prior conduct is relevant solely to establish the defendant's propensity to commit an offense such as the one charged. *People v. Bobo*, 375 Ill. App. 3d 966, 971 (2007). Evidence of other crimes or acts is admissible for a host of purposes other than to show propensity. *People v. Moser*, 356 Ill. App. 3d 900, 913 (2005). Such evidence may permissibly show:

> " '*modus operandi*, motive, knowledge, intent, absence of mistake or accident, defendant's state of mind, absence of an innocent mind frame or the presence of criminal intent, circumstances or context of defendant's arrest, placement of defendant in proximity to the time and place of the crime, identification of the weapon used in a crime, consciousness of guilt, to show a common design, scheme or plan, circumstances of a crime charged that would otherwise be unclear, whether a crime charged was actually committed, opportunity or preparation, a defendant's dislike or attitude toward the victim, to explain an otherwise implausible fact relating to the crime charged, to contradict on rebuttal a defendant's denials, to disprove a defense of entrapment and to disprove an alibi defense.' " *Id.* (quoting *People v. Millighan*, 265 Ill. App. 3d 967, 972-73 (1994)).

Even other-acts evidence that is relevant for a proper purpose is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. *People v. Walker*, 211 Ill. 2d 317, 337-38 (2004). Whether to admit other-acts evidence lies within the sound discretion of the trial court. *People v. Robinson*, 167 Ill. 2d 53, 63 (1995). An abuse of discretion occurs only when the ruling is arbitrary, fanciful, or unreasonable. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 38        The State, arguing strictly under the common-law rule,[3] asserts that the Cookies and Favorites were admissible to show intent. We agree. To explain, we must examine the elements of possession of child pornography as they are defined in section 11-20.1(a)(6) of the Code, which states:

> "(a) A person commits the offense of child pornography who:

---

[3]The State does not cite section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2008)), which partly supersedes the common-law rule by allowing admission of propensity evidence in certain prosecutions. Among them are prosecutions for child pornography (725 ILCS 5/115-7.3(a)(1) (West 2008)).

Notably, Rule 404 of the Illinois Rules of Evidence (Ill. R. Evid. 404 (eff. Jan. 1, 2011)) codifies the common-law rule as well as several statutory provisions, including section 115-7.3. While the common-law and statutory standards that Rule 404 was designed to embody were in force when defendant was tried, Rule 404 itself did not go into effect until after defendant's trial. See *People v. Villa*, 2011 IL 110777, ¶ 32 (Illinois Rules of Evidence not applicable because the defendant was tried before the effective date of the rules).

(6) with knowledge of the nature or content thereof, possesses any film, videotape, photograph or other similar visual reproduction or depiction by computer of any child *** whom the person knows or reasonably should know to be under the age of 18 ***, engaged in any activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection[.]" 720 ILCS 5/11-20.1(a)(6) (West 2008).

Section 11-20.1(b)(5) of the Code (720 ILCS 5/11-20.1(b)(5) (West 2008)) incorporates a voluntariness component into the element of possession:

"The charge of child pornography does not apply to a person who does not voluntarily possess a film, videotape, or visual reproduction or depiction by a computer in which child pornography is depicted. Possession is voluntary if the defendant knowingly procures or receives a film, videotape, or visual reproduction or depiction for a sufficient time to be able to terminate his or her possession."

¶ 39    Since the Code does not define "possess," courts construing the meaning of possessory elements in crimes under the Code have often consulted Black's Law Dictionary, because "[i]n determining the meaning of undefined terms in a statute, a court may turn to the dictionary for assistance" (*Alvarez v. Pappas*, 229 Ill. 2d 217, 225 (2008)). See *People v. Ward*, 215 Ill. 2d 317, 325 (2005) (consulting Black's Law Dictionary to construe the possessory element of the crime of distributing harmful materials to a minor (720 ILCS 5/11–21 (West 2000))); *Josephitis*, 394 Ill. App. 3d at 299 (consulting Black's Law Dictionary to construe the possessory element of child pornography); *Scolaro*, 391 Ill. App. 3d at 679 (same). Black's Law Dictionary defines "possession" as "[t]he fact of having or holding property in one's power; the exercise of dominion over property." Black's Law Dictionary 1201 (8th ed. 2004).

¶ 40    Notably, both *Scolaro* and *Josephitis* concentrated on the meaning of "possess" in sections 11-20.1(a)(6) and (b)(5) without addressing how, if at all, that meaning is modified by the terms "procures" and "receives" in section 11-20.1(b)(5). Neither term appears to be defined in the Code. The primary meaning of "procurement" in Black's Law Dictionary is "the act of getting or obtaining something." Black's Law Dictionary 1244 (8th ed. 2004). Black's Law Dictionary does not define "receive," but another source states its two primary definitions as "to take possession or delivery of" and to "knowingly accept." Webster's Third New International Dictionary 1894 (1993). As we read subsections (a)(6) and (b)(5), "receives" and "procures" do not affect the definition of "possess" but, rather, were included to reinforce that possession can be achieved by active ("procures") or passive ("receives") means.

¶ 41    Borrowing concepts from drugs and weapons cases, the *Josephitis* court held that possession of child pornography can be actual or constructive. Actual possession "does not require present personal touching of the illicit material but, rather, present personal dominion over it." *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). "Constructive possession exists without actual personal present dominion over [contraband], but with an intent and capability to maintain control and dominion." *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992). Mere presence in the vicinity of contraband cannot establish constructive possession. *People v.*

*Scott*, 367 Ill. App. 3d 283, 285 (2006).[4] *Josephitis* did not expound on what, generally, will constitute actual or constructive possession of electronic images of child pornography.

¶ 42    Here, the Cookies and Favorites were admissible for a purpose other than to show defendant's propensity to commit a crime such as possession of child pornography. The defense at trial was that defendant did not seek out the images of child pornography saved as TIFs but, rather, those images appeared by happenstance on his computer screen as he browsed for adult pornography. The Cookies and Favorites, however, suggest that defendant sought out, intended to revisit, and indeed did revisit sites with names and descriptions suggestive of child pornography. Other crimes or acts are admissible to show, *inter alia*, intent, knowledge, and absence of mistake or accident. Defendant's demonstrated interest in child pornography tended to show that his accessing of illicit images was knowing and voluntary rather than inadvertent.

¶ 43    To explain further, we discuss in detail *Josephitis* and *Scolaro*. Both cases are from the First District Appellate Court and, so, are not binding on this court. We follow them because their analyses are sound.

¶ 44    In both *Josephitis* and *Scolaro*, images of child pornography were discovered in the TIF folder or web cache of the defendant's hard drive, and there was expert testimony that the images would have been saved automatically as TIFs when the Web pages that displayed them were loaded onto the computer screen. *Josephitis*, 394 Ill. App. 3d at 296-97; *Scolaro*, 391 Ill. App. 3d at 674, 676. Each defendant admitted to the police that he subscribed to Web sites that displayed images of child pornography, and that he visited the sites and viewed images of child pornography. *Josephitis*, 394 Ill. App. 3d at 296; *Scolaro*, 391 Ill. App. 3d at 673-74. The defendant in *Josephitis* further admitted that he not only viewed but also " 'stored' " images from the child-pornography Web sites. *Josephitis*, 394 Ill. App. 3d at 296. The defendant in *Scolaro* admitted not only that he subscribed to and visited sites of child pornography, but also that he received images of "young boys, fully naked" from individuals in chat rooms, and that he sometimes sent such pictures to others. *Scolaro*, 391 Ill. App. 3d at 674.

¶ 45    Also, in both *Josephitis* and *Scolaro*, the police showed the defendant the TIF images of child pornography that were recovered from his computer, and the defendant identified them as being among the images he previously viewed on the Web sites of child pornography to which he subscribed. *Josephitis*, 394 Ill. App. 3d at 296; *Scolaro*, 391 Ill. App. 3d at 674.

¶ 46    Each defendant claimed, however, that there was no evidence that he was aware that his computer was automatically storing copies of Internet images as they loaded on the screen, or that he otherwise had knowledge of the TIF images. *Josephitis*, 394 Ill. App. 3d at 300-01;

---

[4]These principles are summarized in Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000):

> "Possession may be actual or constructive. A person has actual possession when he has immediate and exclusive control over a thing. A person has constructive possession when he lacks actual possession of a thing but he has both the power and the intention to exercise control over a thing [either directly or through another person]."

*Scolaro*, 391 Ill. App. 3d at 677. The court in *Josephitis* acknowledged that "the mere presence of images or files in the cache is not sufficient to support a finding of possession." *Josephitis*, 394 Ill. App. 3d at 306. Similarly, the court in *Scolaro* held the State to its burden of "prov[ing] that defendant knowingly possessed child pornography in the cache folder of his computer." *Scolaro*, 391 Ill. App. 3d at 676.

¶ 47 A careful reading of *Josephitis* and *Scolaro* reveals a distinction in how the presence of a TIF image can prove possession of child pornography. To demonstrate this, we set forth the core portions of the court's analysis in each case. First, the court in *Scolaro* reasoned:

"Here the record shows that the child pornography was saved as temporary files on defendant's home computer. Defendant 'reached out' for images by subscribing to Web sites that contained images of child pornography. Defendant admitted to forwarding images to others and receiving images of fully naked boys. Even if there had been no indication in the record that defendant had copied, printed, e-mailed, or sent images to others, defendant had the ability to do so when he was viewing the downloaded Web pages. [Citation.]" *Scolaro*, 391 Ill. App. 3d at 680.

The reasoning in *Josephitis* was analogous:

"[T]he mere presence of images or files in the cache is not sufficient to support a finding of possession. However, these files, even absent knowledge of their presence or how to control them may be proper evidence of *past possession*. With analysis and testimony of a forensic expert, it may be established that a defendant viewed images at a certain time and date. In this case testimony and evidence were provided that defendant actively sought out the illicit Web sites, paid for access, maintained the Web sites among his 'favorites,' and viewed numerous photos of child pornography in the three weeks leading to his arrest. The evidence also demonstrated that defendant had the opportunity to e-mail, save, print, copy, or otherwise manipulate the images while he viewed them.

*** [E]vidence of an extensive search or paying for access and viewing images on a computer establishes both knowledge and dominion and control to support a possession finding. Based on the testimony at trial, defendant actively sought out and paid for access to child pornography Web sites and viewed over 700 images that were found in the cache files of defendant's computer with various origin dates from two months prior up to the date defendant's computer was confiscated. This is sufficient to show that defendant had knowledge of the contents and possession for a period long enough to terminate possession." (Emphasis added.) *Josephitis*, 394 Ill. App. 3d at 306.

¶ 48 *Josephitis* and *Scolaro* distinguish between possession of a TIF image and "past possession" (*Josephitis*'s phrase) of the original image as it appeared to the defendant on his computer screen, and of which the TIF image is a copy. Both theories of possession began with the TIF images. First, the TIFs served as proof that the defendant viewed the original images. The inference was enabled by evidence that the TIF folder consisted of copies of Internet images stored automatically as the images were loaded onto the defendant's computer screen. As *Josephitis* and *Scolaro* show, however, even if the images did at one time appear on the defendant's computer screen, the State still must prove that the defendant knowingly and voluntarily possessed the images. The element of knowledge in sections 11-

20.1(a)(6) and (b)(5) requires the State to demonstrate that the images did not appear on the screen by accident but, rather, were sought out by the defendant because of their content.

¶ 49    In *Josephitis* and *Scolaro*, there was both direct and circumstantial evidence of knowledge. The direct evidence consisted of the fact that, when the police showed the defendant the TIF images that were the basis of the criminal charges, the defendant identified them as among the images that he had viewed in visiting the Web sites of child pornography to which he subscribed. *Josephitis*, 394 Ill. App. 3d at 296; *Scolaro*, 391 Ill. App. 3d at 674. The circumstantial evidence in the cases was diverse. First, in each case the defendant admitted that he subscribed to, and visited, Web sites of child pornography, where he viewed images. *Josephitis*, 394 Ill. App. 3d at 295-96; *Scolaro*, 391 Ill. App. 3d at 673-74. The defendant in *Josephitis* further admitted that he " 'stored' " images viewed on the Web sites. *Josephitis*, 394 Ill. App. 3d at 296. The defendant in *Scolaro* also admitted that he had exchanged, over the Internet, images of "young boys, fully naked." *Scolaro*, 391 Ill. App. 3d at 674.

¶ 50    As for the mechanics of the possession itself, the defendants in both *Josephitis* and *Scolaro* argued that the viewing of an Internet image cannot alone constitute possession under sections 11-20-1(a)(6) and (b)(5), but that there must also be evidence that the viewer exercised dominion or control over the image by, *e.g.*, copying, printing, e-mailing, or saving it. See *Josephitis*, 394 Ill. App. 3d at 301; *Scolaro*, 391 Ill. App. 3d at 676. Disagreeing, both courts deemed it sufficient that the defendant had the "opportunity" (*Josephitis*, 394 Ill. App. 3d at 306) or "ability" (*Scolaro*, 391 Ill. App. 3d at 680) to exercise those functions while viewing the image. The courts were not explicit, but both appeared to hold that the possession was constructive, not actual.

¶ 51    Section 11-20.1(b)(5) requires that possession of the original image be voluntary as well as knowing. The element of voluntariness is satisfied by proof that the knowing procurement or reception was "for a sufficient time to be able to terminate *** possession." 720 ILCS 5/11-20.1(b)(5) (West 2008). Thus, where the only proof of possession is that the defendant viewed the image while he had the ability (unexercised) to print it, save it, *etc.*, the defendant will have had to linger over the original image longer than necessary to terminate his possession, as by closing the Web site.

¶ 52    TIF images not only can serve as indirect evidence of possession of the original images, but can themselves be the basis for liability. *Scolaro* held that the defendant knowingly and voluntarily possessed the TIF images themselves. The court cited the presence of specialized file-elimination software as evidence that the defendant was aware that TIFs of pornographic images were automatically created as he viewed them on Web sites. *Scolaro*, 391 Ill. App. 3d at 680. In *Josephitis*, the court appeared to agree with the defendant that there was "no evidence that he knew that the pornographic images were automatically saved on his computer," and therefore the defendant was liable only for "past possession" of the original images. *Josephitis*, 394 Ill. App. 3d at 301, 306. *Josephitis* and *Scolaro* together demonstrate that, though a TIF can serve as proof that the defendant viewed the original image, it is analytically possible for a defendant to knowingly and voluntarily possess the original image without knowingly and voluntarily possessing the TIF.

¶ 53    Defendant is correct that the State did not specifically link the Cookies and Favorites to any of the nine TIF images on which defendant's convictions were based. Neither, however, did the State in *Josephitis* or *Scolaro* connect any of the TIF images to the Web sites that the defendants admitted visiting, but the courts nonetheless found the defendants' browsing histories relevant to show that the viewing of the original images was not inadvertent, but by design. See *Josephitis*, 394 Ill. App. 3d at 306 ("In this case testimony and evidence were provided that defendant actively sought out the illicit Web sites, paid for access, maintained the Web sites among his 'favorites,' and viewed numerous photos of child pornography in the three weeks leading to his arrest."); *Scolaro*, 391 Ill. App. 3d at 680 ("Defendant 'reached out' for images by subscribing to Web sites that contained images of child pornography."). Similarly, here the Cookies and Favorites, which reflected an intense interest in child pornography, lessened the probability that the nine TIF images were fortuitously present on defendant's hard drive.

¶ 54    This case involves relatively new technology, but the rules of evidence that govern here are of an old vintage. The case law fully establishes that the State may adduce evidence of the defendant's proclivities or past conduct in order to prove intent or knowledge in the case *sub judice*. See, *e.g.*, *Bobo*, 375 Ill. App. 3d at 971-72 (proof of the defendant's apparent foot fetish allowed to establish intent to gratify himself by manipulating the victim's foot during the sexual attack); *People v. Hart*, 338 Ill. App. 3d 983, 992-93 (2003) (to prove that the defendant intended to steal a briefcase from a department store, though he had not left the store before being stopped by store employees, the State was allowed to introduce the defendant's prior uncharged theft of a trench coat occurring 12 days before at the same store); *People v. Juarbe*, 318 Ill. App. 3d 1040, 1054-55 (2001) (to prove that the defendant had knowledge of, and intent to deliver, drugs concealed inside the armrest of his car, the State was allowed to introduce evidence that the residence that the defendant had just left before being stopped by officers was a " 'stash house,' " known for drug activity, that the defendant had visited the house several times in the four months before his stop and arrest, and that the defendant's fingerprints were found on drug packaging materials within the residence); *People v. Parrott*, 244 Ill. App. 3d 424, 432 (1993) (where the defendant, who had been committed as a sexually dangerous person, was alleged to have violated the terms of his conditional release by having unsupervised contact with children or adolescents, and children testified that the defendant approached them, asked for sex, and produced from a bag several pictures of nude persons having sex, but the defendant testified that the encounter was innocent, the State was allowed to introduce evidence of sexually explicit materials contained in the bag that the defendant was carrying); *United States v. Chambers*, 642 F.3d 588, 595 (7th Cir. 2011) (in trial for attempted child enticement based on the defendant's sexually explicit chat-room discussion with undercover officer and transfer of images of child pornography to the officer, proper other-acts evidence included (1) the defendant's sexually explicit chat-room conversations with other undercover officers, which showed motive, intent, and absence of mistake; and (2) images of child pornography found on his computer, which showed "his ability to transport child pornography to [the undercover agent]" and "his sexual inclination toward children").

¶ 55    The Cookies and Favorites tended to show that defendant knowingly and voluntarily

possessed not only the original images, but also the TIFs. Defendant admitted in the recorded statement that he was aware that his computer automatically saved images as he viewed them on the Internet. Moreover, defendant's remark (also in his recorded statement) that he possessed on his hard drive "probably" fewer than 100 pornographic images of girls younger than 17 can reasonably be read as an admission to specific knowledge of *some* prohibited images on his hard drive. The Cookies and Favorites bolstered these admissions by serving to explain not only why defendant would have such TIFs on his hard drive in the first instance, but also why he had not terminated his possession by deleting them.

¶ 56    Defendant argues that a certain remark made by the State below contradicts its present assertion that the Cookies and Favorites served a purpose other than to show propensity. In opposing the motion for a directed finding, the State argued as follows (we have italicized the specific language that defendant identifies):

> "So what are some of the things that are on [defendant's] favorites? What are some of his Favorite websites? Some of the ones I would point out are petite teen girls, teen funs, tight delights, petite nympha, young petite nympha and her pretty thumbs collection, happy teens, Lolita Mpegs. And this is a very important one. We heard [Sand] testify that Lolita is a term specifically associated with child pornography, and that Mpeg was a description of a video file.
>
> Now, I know that none of the charged images are movie files, but it's important. You know, it goes back to *Josephitis* and *Scolaro*, we have to prove that he specifically sought out the prohibited images. And someone who has Lolita Mpegs on their Favorites *is the type of individual* who is out there seeking this type of material." (Emphasis added.)

Defendant construes the State's phrase "type of individual" as an admission that the evidence was relevant only to show propensity. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (the risk associated with other-acts evidence is that the fact finder will convict the defendant simply because he is "a bad person deserving punishment"). The context, however, shows that the State was using the Cookies and Favorites to prove intent, namely, that the TIF images were not present by accident but, rather, were "specifically sought out" by defendant. Moreover, this was a bench trial, so even if the State offered the Cookies and Favorites for an improper purpose, we would conclude, because there is no indication to the contrary, that the trial court considered the Cookies and Favorites only for a proper purpose. See *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43 (reviewing court presumes that the trial court followed the law unless the record shows otherwise). In any event, we may affirm the admission of evidence on any basis appearing in the record, regardless of whether it was relied on by the trial court. *Donaldson v. Central Illinois Public Service Co.*, 313 Ill. App. 3d 1061, 1075 (2000). We evaluate the Cookies and Favorites based on their objective relevance, not the relevance accorded them by the State or even the trial court.

¶ 57    Finally, we recognize that, even if other-acts evidence is relevant for a proper purpose, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Defendant, however, does not argue under this standard until his reply brief, where again he seeks to establish that the State itself believed that defendant's browsing history was mere propensity evidence. Again, this argument fails. Furthermore, it is manifest that the

-17-

relevance of the Cookies and Favorites far surpassed any potential for unfair prejudice.

¶ 58 We conclude that the trial court did not err in admitting the Cookies and Favorites. Since there was no error, there can be no plain error. *People v. Bannister*, 232 Ill. 2d 52, 79 (2008).

¶ 59 B. Sufficiency of the Evidence

¶ 60 Defendant's second and final argument on appeal is that the evidence was inadequate to establish his guilt. We disagree.

¶ 61 A challenge to the sufficiency of the evidence in a criminal trial requires us to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). We will reverse a criminal conviction only if the evidence was so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008).

¶ 62 Defendant questions, first, the reliability of the unrecorded statement as described in Fry's testimony. He submits that the incriminatory remarks it contains were the product of "extensive leading and suggestiveness." Defendant, however, does not attempt to identify any specific instance of a suggestive or leading question, but relies on conjecture alone. Our own review of the statement reveals no hint that the officers suggested particular language to defendant.

¶ 63 Defendant further asserts that the recorded statement is "conveniently missing critical elements and alleged admissions" that were included in his unrecorded statement, such as that he sought out Web sites of pornography involving children within a certain age range (ages 13 to 15), that he would "click on whatever image was interesting to him," and that he would return to the Web sites "that he was interested in to revisit the same pictures he liked." Defendant asserts that it is "highly suspect" that his recorded statement contains no comparable admissions. Defendant also finds it significant that the State never asked Huffman to corroborate Fry's testimony regarding the unrecorded statement. Lastly, defendant claims that the trial court failed to distinguish between the recorded and unrecorded statements in its ruling, but referred to them collectively as defendant's "confession."

¶ 64 On the last point, we note that defense counsel did, in fact, identify for the trial court the disparities between the statements, and argued that the unrecorded statement was unreliable. Evidently, the trial court tacitly rejected this argument. Defendant's remaining points all touch on the soundness of the court's credibility determination. The court below was in a far better position to observe the witnesses and assess their believability. *Wheeler*, 226 Ill. 2d at 114. Defendant has identified no point on which deference to the trial court is inappropriate. Moreover, as we explain below, defendant's recorded statement contains sufficiently incriminatory admissions to support, together with the Favorites and Cookies, his conviction of possession of child pornography.

¶ 65 Defendant next maintains that the evidence in this case did not approach the strength of the State's proof in *Josephitis* and *Scolaro*. There are factual differences between this case and those authorities, but they are not decisive. As a threshold matter, there was sufficient

-18-

evidence to exclude the possibility that the Cookies, Favorites, and nine TIF images of child pornography were attributable to some user other than defendant. The Favorites were associated with defendant's password-protected AOL accounts. As for the Cookies and the TIF images, the only other potential user who could have been responsible for them was Bowlden, but he testified that he owned his own computer and never used defendant's. Defendant produced no evidence challenging Bowlden's testimony.

¶ 66    We proceed, then, from the well-grounded premise that defendant was the sole user of his computer when the nine TIF images of child pornography were saved to his web cache. As *Josephitis* and *Scolaro* demonstrate, a TIF image of child pornography can be the basis of liability for possession of the TIF image, the original image, or both, but in all cases the possession must be both knowing and voluntary. To recapitulate our analysis of the governing law (*supra* ¶¶ 44-54), a defendant who knowingly views an Internet image of child pornography while aware of the automatic caching of Internet images, and who retains the TIF image longer than is necessary to terminate possession, is liable for possession of the TIF image itself.[5] Alternatively, if the defendant knowingly views an Internet image of child pornography while unaware of the TIF function, but, with the ability to save, copy, print, e-mail, or otherwise manipulate the image, views it longer than is necessary to terminate possession of it, the defendant is liable for possession of the original image. For possession of the TIF or the original image to be knowing, the defendant must have searched out or received the original image because of its content. That the image was viewed by design can be proved by direct or circumstantial evidence.

¶ 67    Here, the trial court found defendant guilty on the counts corresponding to the nine TIF images, because defendant was able to "retrieve the [TIFs] for viewing." The court found defendant not guilty of possession of the lost files, because "that same ability was not present." Evidently, the court's criterion was whether defendant could access the images of child pornography at the time of his arrest. The TIF images met this criterion, but the original images and lost files did not. Our review, however, "is of the trial court's judgment, not its reasoning," and so "the trial court's judgment may be sustained for any appropriate reason regardless of whether the trial court relied on those grounds and regardless of whether the trial court's reasoning was correct." *People v. Johnson*, 231 Ill. App. 3d 412, 419 (1992). As our preceding discussion makes clear, the trial court's view of possession was too narrow, as TIF images can serve as evidence of past possession of original images that were no longer accessible to the defendant at the time of his arrest.

¶ 68    Here there was sufficient evidence that defendant possessed both the TIFs and the original images to which the TIFs corresponded. Defendant, as we previously discussed, questions the reliability of the unrecorded statement. We therefore begin our discussion with the *recorded* statement and hold that it, combined with the Cookies and Favorites, contains sufficient evidence that defendant knowingly and voluntarily possessed child pornography. First, the trial court may well have found incredible defendant's claims that he would simply

---

[5]Conceivably, a defendant can become aware of a TIF without having viewed the original image.

happen upon images of child pornography while browsing for adult pornography and that, although he would "go[ ] back and look[ ] at the same images [of child pornography] more than once," the only reason he was successful in seeing the same images again was that they would "pop up" again.

¶ 69     Second, regardless of how defendant came across images of child pornography, he admitted that he would "click on" such images in order to "open" (presumably, enlarge) them for better viewing. Thus, defendant went beyond a mere glance, apparently focusing his attention on images of child pornography for their content. That defendant would enjoy such images is confirmed by the Cookies and Favorites, according to which defendant not only visited numerous different Web sites of child pornography, some upwards of 100 times, but also designated several as preferred Web sites. The Cookies and Favorites are a compelling witness to defendant's interest in, if not obsession with, child pornography, and his willingness to access it on the Internet. When defendant viewed the original images, he had, like the defendants in *Josephitis* and *Scolaro*, the ability to print, copy, e-mail, save, send, and otherwise exercise control over the images. The recorded statement also supports the inference that defendant, given his demonstrated interest in the material, lingered over the images "for a sufficient time to be able to terminate [his] possession" (720 ILCS 5/11-20.1(b)(5) (West 2008)). Together with the Cookies and Favorites, the recorded statement establishes that defendant knowingly and voluntarily possessed the original images of child pornography as he viewed them on his computer screen.

¶ 70     The recorded statement also establishes that defendant knowingly and voluntarily possessed the TIF images. Regarding the images of child pornography that he would "come across," defendant was asked, "[D]o you save these images on your hard drive on your computer?" He answered, "No. I'm just assuming that the computer does that on [its] own." When asked how many pornographic images of children under 17 were on his hard drive, defendant answered, "Probably less than 100." This answer can reasonably be construed as an admission to specific knowledge of *some* prohibited images on the hard drive. Presumably, this was the evidence from which the trial court concluded that defendant was aware of the TIF images. We have no grounds for overturning that factual finding. Evidently, the court also found, though tacitly, that defendant possessed the TIFs "for a sufficient time to be able to terminate [his] possession" (720 ILCS 5/11-20.1(b)(5) (West 2008)). This finding was well grounded, given defendant's knowledge of the TIFs and the length of time that they had remained on his hard drive before his arrest (the oldest TIF was dated July 9, 2006, and even the newest, dated October 10, 2007, was created several hours before defendant's arrest).

¶ 71     As for the unrecorded statement, it contains the more direct admissions of a deliberate search for child pornography. Defendant admitted that, for the past five years, he had been seeking Web sites featuring girls under 17 and that his preferred age range was 12 to 15, which is when children "were just starting to develop." When visiting those Web sites, he would "click on" images of child pornography that interested him, and he would revisit sites to view the same images again. The Cookies and Favorites powerfully corroborate these admissions. While either the recorded statement or the unrecorded statement would, in conjunction with the Cookies and Favorites, present more than adequate evidence that

defendant knowingly and voluntarily possessed the original images, together the statements present overwhelming proof of possession of those images.

¶ 72 On the question of possession of the TIFs, the unrecorded statement neither confirms nor denies that defendant had knowledge of the automatic caching function of his computer. As we noted, adequate proof that defendant knew of that function lay in the recorded statement. The unrecorded statement does, however, suggest that, if defendant was aware of the TIF function, it would not have been surprising that defendant still possessed TIFs of child pornography at the time of his arrest, such was his interest in the material.

¶ 73 We acknowledge that the only arguably *direct* evidence that defendant knowingly and voluntarily possessed images of child pornography was his stated belief that fewer than 100 pornographic images of girls under 17 were saved on his hard drive. Despite defendant's emphatic insistence to the contrary, the lack here of such direct evidence as there was in *Josephitis* and *Scolaro* is not decisive. Illinois case law (*supra* ¶ 54) is replete with prosecutions in which the State was permitted to prove by circumstantial evidence, including other-acts evidence, such elements or factors as intent, knowledge, and absence of mistake or accident. Nothing in section 11-20.1(a)(6) or (b)(5) of the Code suggests that the crime of possession of child pornography is any exception.

¶ 74 We uphold defendant's convictions of possession of child pornography.

¶ 75 III. CONCLUSION

¶ 76 For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 77 Affirmed.