NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230124-U

NO. 4-23-0124

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JEFFREY LYNN MARTIN, | ) | No. 17CF1015 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The evidence adequately established defendant's knowing and voluntary possession of child pornography.

(2) Defendant's waiver of counsel was knowing and intelligent despite the trial court greatly overstating the potential sentence when admonishing him under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), as the record showed defendant's waiver was not based on the error.

(3) Because the action defendant argues constituted an improper search of his computer—the opening of unobscured shortcuts to Internet pages—did not constitute a search, defendant has failed to show the trial court erred in allowing the admission of the corresponding evidence.

¶ 2    After a trial during which defendant, Jeffrey Lynn Martin, represented himself, a jury found him guilty of 10 counts of possession of child pornography: 8 counts were based on possession of a visual image of a person he should have known to be under the age of 13 (720 ILCS 5/11-20.1(a)(6), (c-5) (West 2014))—Class 2 felonies—and 2 counts were based on

possession of a visual image of a person he should have known to be under the age of 18 (720 ILCS 5/11-20.1(a)(6), (c) (West 2014))—Class 3 felonies. Defendant received an aggregate sentence of 28 years' imprisonment.

¶ 3        On appeal, defendant makes three claims of error. First, he contends the evidence indicating his possession of the images was knowing and voluntary was insufficient to support the convictions. Second, he contends he lacked the necessary information to waive counsel because he received multiple estimates regarding his potential aggregate sentence, all of which were much higher than the correct number. Third, he argues the police officer's "warrantless search of the computer [containing the pornography] by clicking on a link that was displayed on the computer's desktop" was an illegal search and, consequently, the evidence resulting from the search should have been suppressed.

¶ 4        We affirm.

¶ 5                                    I. BACKGROUND

¶ 6        Each of defendant's claims of error turns on a different set of facts. Therefore, we address those facts before the analyses of each claim. We here discuss the general background.

¶ 7        In September 2017, defendant was charged by indictment with 13 counts of possession of child pornography. Each count alleged the possession occurred between October 2014 and December 2015. The State ultimately dropped 3 of the counts, leaving the 10 counts of which defendant was convicted. Two other felony cases against defendant, McLean County case Nos. 16-CF-52 and 16-CF-231, were then pending against defendant. The State elected to proceed with case No. 16-CF-231 before proceeding with the present case.

¶ 8        Defendant's trial took place in November 2022. He appeared *pro se*. The jury found him guilty on all 10 counts. He did not file a posttrial motion. The sentencing hearing took place

in February 2023. Defendant remained *pro se* at the hearing. The trial court sentenced defendant to 14-year terms of imprisonment for each of the convictions relating to victims under the age of 13 and 5-year terms of imprisonment for each of the convictions relating to victims under the age of 18. The second four of the 14-year terms were to be consecutive to the first four of the 14-year terms. The five-year terms were to run concurrently with one another and with the other terms. The court sentenced defendant to an aggregate term of 28 years. Defendant did not file a postsentencing motion.

¶ 9        This appeal followed.

¶ 10                              II. ANALYSIS

¶ 11                      A. Sufficiency of the Evidence

¶ 12              1. *Facts Relevant to the Sufficiency of the Evidence*

¶ 13        The charges at issue were based on images recovered from an all-in-one computer found in a bedroom of a house defendant formerly occupied. Defendant does not contest he was the only person who had access to the computer or that the images on which his convictions were based depicted victims of the ages the State alleged. We thus need not address the evidence tending to establish those matters. The primary evidence relevant to possession of the images came from the testimony of Normal police Officer Jason Wood, who was assigned to "a specialty division where [he dealt] with technology," the testimony of Bloomington police Sergeant Josh Swartzentruber, who specialized in cybercrimes, and, to a lesser extent, the testimony of Normal police Detective Brad Park and Sarah Joann Stephens, the woman with whom defendant had lived.

¶ 14        According to the evidence at trial, Thomas O'Donnell, who was visiting Stephens's home looking for items Stephens could sell, noticed the all-in-one computer in a bedroom mostly used as a storage area. He suggested it was a salable item provided it was not password protected.

His assistant, Ken Gusek, plugged it in and turned it on. It had no password protection and opened immediately to the desktop. Gusek noticed material he thought was "bad" and called for assistance. Detective Park, who testified he was present in Stephens's house to support her as she tried to get rid of property she had purchased for defendant, came to look at the computer desktop. He immediately noted the presence of links to websites, which had names that were "sexual in nature." He opened one link "that opened up [and] showed a very young female performing oral sex on a male." Park therefore seized the computer and obtained a search warrant to search its contents.

¶ 15 Officer Wood testified he received the computer from Park. He immediately used a standard forensic program to create an "image"—a complete copy on another device—of the contents of the computer's hard drive. A program associated with the one for making the hard drive image created a "hash value" of the hard drive. Wood described the hash value as a "thumbprint" and "a unique identifier that identifies kind of the data sets within the hard drive." The use of the hash values allowed Wood to ensure the image was an accurate copy of the data on defendant's computer.

¶ 16 When asked by defendant, Wood agreed, for a person familiar with computers, "clean[ing] temporary internet files out of a computer" was "pretty basic, pretty simple." Wood also explained shortcuts to websites—such as were present on defendant's computer desktop—only exist because the user has created them.

¶ 17 Sergeant Josh Swartzentruber testified he had worked for 11 years in the "digital forensics lab assigned to the cyber crimes unit." The trial court qualified Swartzentruber as an "expert in the area of forensic computer examination."

¶ 18 Swartzentruber testified Wood asked for assistance analyzing the image of defendant's computer. This analysis showed the computer had been running a version of a

Windows operating system installed on October 15, 2014. Wood used a forensic program to search the image of the computer for Uniform Resource Locators (URLs) used for accessing the Internet. He found several URLs significant in a child pornography investigation. These included "fantasy mattress nudist children girls" and "so young teen girls wanted." Another significant URL was "first time little Lolita," for which defendant's computer had a desktop shortcut. A user would need to choose to create a desktop shortcut by using a "right click." The term "Lolita" was significant in child pornography investigations as "a search term used to acquire young girls."

¶ 19        Swartzentruber searched the image of the computer's hard drive for allocated space with child pornography images. He agreed with the State's explanation that space becomes "allocated" when a file is saved to a hard drive and the "computer designates [the particular space] as space that contains a file." When a file is deleted, the space it uses becomes "unallocated" and another file can be written over it. Swartzentruber did not find any child pornography images in the allocated space as such.

¶ 20        Swartzentruber also examined the stored Internet browser history, which included images stored as "temporary internet files" by the browser and information about those images. Swartzentruber also referred to such stored files as "cached." The creation of a stored Internet history and the caching of images was automatic and not the user's choice. Swartzentruber agreed cached images were "stored in the *** temporary internet file." A user could access cached images and treat them like other images, for instance by moving a cached image to another directory or e-mailing it.

¶ 21        The image of the computer hard drive contained a copy of a "volume shadow copy." According to Swartzentruber, a "volume shadow copy is a file that caches or *** [is] an image caught in time." It "captures everything that you've done" in a "specific timeframe." He further

explained, using slightly different terms, the volume shadow copy was a timed backup. It could be used if the computer malfunctioned to restore the computer to its state at the time the backup was made. A volume shadow copy would include copies of the temporary internet files as they existed when the computer made the copy.

¶ 22        Swartzentruber testified the image of the volume shadow copy from defendant's computer contained temporary internet files, among which he found multiple images he deemed relevant to the investigation. He identified 13 images, including the 10 on which the prosecution was based, as significant files from the shadow volume copy. The copy of the temporary internet files also contained URLs visited, including "a hundred thirteen logged pornographic websites," one of which was "www dot xxx pussy teen dot com." For this web address to appear in the volume shadow copy of the temporary internet files, the computer user would have needed to visit the site.

¶ 23        Swartzentruber visited the "pussy teen" web address using his work computer, which contained EnCase, a form of forensic software he was certified to use. He discovered the site required a "membership," but through his EnCase forensic software he "was able to see some things associated with that." He recognized one of the photographs appearing on the site as the same image as State's exhibit A9, one of the images defendant was charged with possessing.

¶ 24        Swartzentruber used a program called "Internet Evidence Finder" to examine the entire image of the computer. He found 353 URLs containing the word "teen" and 75 URLs containing the word "young."

¶ 25        Under cross-examination, Swartzentruber testified, while searching the image of the computer's hard drive with forensic software, he found defendant's name "several times."

¶ 26        Defendant recalled Wood as his witness. In questioning Wood, he referred to five images, none of which were State's exhibits and had been otherwise excluded as evidence prior to

trial. The trial court permitted the State to cross-examine Wood concerning these images. Wood testified the software he used allowed him to identify probable child pornography images by comparing the hash value of files taken from the computer with the hash value of files in the National Reference Library database of hash values for files of known child pornography. According to Wood, hash values are "unique to [an] image," so if the hash value of any file matches a file in the database, the software will alert the investigator the unknown file is relevant to a child pornography investigation. The software alerted Wood to five files from the computer. Three of the alerts related to images in unallocated space, implying "the user after downloading it, then deleted it."

¶ 27        Stephens, called by the State, testified she was 87 years old at the time of the trial. She met defendant when the person who did her yard work introduced him as someone who could install a sound system for her television. They had little contact after he did the installation for her. However, he moved into her house after she agreed to put him up for the night. She described his treatment of her as physically abusive.

¶ 28        Defendant seemed familiar with electronics when he installed the sound system. He tutored Stephens on computer use, but he only he used the all-in-one computer. Stephens considered defendant much more knowledgeable about computers than she was.

¶ 29                          2. *The Arguments*

¶ 30        Defendant argues the evidence he knowingly and voluntarily possessed the child pornography images was insufficient to sustain his convictions. He notes sections 11-20.1(a)(6) and 11-20.1(b)(5) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-20.1(a)(6), (b)(5) (2014)) require possession of a child pornography image to be both knowing and voluntary. Defendant further states cases, including *People v. Gumila*, 2012 IL App (2d) 110761, ¶ 46, 981 N.E.2d 507,

*People v. Josephitis*, 394 Ill. App. 3d 293, 306, 914 N.E.2d 607, 616-17 (2009), and *People v. Scolaro*, 391 Ill. App. 3d 671, 676, 910 N.E.2d 126, 130 (2009), have held the mere presence of temporary internet files automatically cached by a computer program is insufficient to prove illicit possession of child pornography images.

¶ 31        Defendant relies on *Gumila*, which holds:

"As *Josephitis* and *Scolaro* demonstrate, a [temporary internet file (TIF)] image of child pornography can be the basis of liability for possession of the TIF image, the original image, or both, but in all cases the possession must be both knowing and voluntary. *** [A] defendant who knowingly views an Internet image of child pornography while aware of the automatic caching of Internet images, and who retains the TIF image longer than is necessary to terminate possession, is liable for possession of the TIF image itself. Alternatively, if the defendant knowingly views an Internet image of child pornography while unaware of the TIF function, but, with the ability to save, copy, print, e-mail, or otherwise manipulate the image, views it longer than is necessary to terminate possession of it, the defendant is liable for possession of the original image. For possession of the TIF or the original image to be knowing, the defendant must have searched out or received the original image because of its content. That the image was viewed by design can be proved by direct or circumstantial evidence." *Gumila*, 2012 IL App (2d) 110761, ¶ 66.

¶ 32        Defendant argues the evidence of his illicit possession was much weaker than the evidence produced by the State in *Gumila*, *Josephitis*, or *Scolaro*. In particular, he notes the State did not present any evidence of his lingering over specific images, rather than, for instance, "quickly scrolling past them while browsing pornography online." Moreover, he notes he did not

make any admissions relating to the child pornography images or his specific knowledge of computer functioning. He thus contends the evidence was insufficient.

¶ 33    The State argues it has met its burden because "[t]he evidence of defendant's browsing history, his user-created desktop shortcuts, and the nature of the other images found on his computer was circumstantial evidence that defendant *knowingly and voluntarily searched* for images of child pornography and did not merely encounter them inadvertently." (Emphasis added.)

¶ 34                    3. *The Reasonable Doubt Standard*

¶ 35    Under the standard set forth by the United States Supreme Court, when evaluating the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276-77 (1985) (adopting the *Jackson* standard). It is not the function of a reviewing court to retry the defendant, nor may we "substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *People v. Conway*, 2023 IL 127670, ¶ 16, 220 N.E.3d 1019. "A criminal conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Conway*, 2023 IL 127670, ¶ 16.

¶ 36                    4. *Law Concerning the Proof of Knowing and Voluntary Possession of Child Pornography on a Personal Computer*

¶ 37    To prove possession of child pornography under the Code, the State must show not mere possession of the images, but also (1) this possession was "with knowledge of the nature or content" of the images serving as the bases for the charges (720 ILCS 5/11-20.1(a)(6) (West 2014))

- 9 -

and (2) the possession is voluntary (720 ILCS 5/11-20.1(b)(5) (West 2014)). "Possession is voluntary if the defendant knowingly procures or receives *** [an image] for a sufficient time to be able to terminate his or her possession." 720 ILCS 5/11-20.1(b)(5) (West 2014)). This voluntariness requirement adds a second *knowledge* element: the defendant must have "knowingly procure[d] or receive[d]" the image. 720 ILCS 5/11-20.1(b)(5) (West 2014)). Knowing reception or procurement of a child pornography image can be proved by evidence a defendant deliberately sought out such images. See *Josephitis*, 394 Ill. App. 3d at 301 (finding evidence the defendant sought out child pornography, combined with indicia of his dominion and control over those images, was sufficient to prove illicit possession).

¶ 38      Possession may be actual or constructive. To prove actual possession, the State must provide adequate evidence of the defendant's "present personal dominion over [the illicit material]." (Internal quotation marks omitted.) *Gumila*, 2012 IL App (2d) 110761, ¶ 41. To prove constructive possession, the State must provide adequate evidence of the defendant's "intent and capability to maintain control and dominion [of the material]." (Internal quotation marks omitted.) *Gumila*, 2012 IL App (2d) 110761, ¶ 41. In the case of physical contraband, dominion and control is typically demonstrated by showing nonpassive acting by the defendant upon the contraband; for instance, the defendant can be shown to have exercised dominion and control over contraband by concealing it or throwing it away. See, *e.g.*, *People v. Abram*, 2016 IL App (1st) 132785, ¶ 86, 50 N.E.3d 1197. But, as demonstrated by the rule for showing constructive possession, intentionally maintaining control of contraband is an act of possession.

¶ 39      Special issues of proof appear when a defendant is charged with possessing child pornography images electronically. Many users of electronic devices have limited knowledge of

the functioning of those devices. This limited knowledge may create uncertainties concerning a defendant's dominion and control over images to which a user may not have simple access.

¶ 40　　　　*Gumila* made it clear the State can use temporary internet files to address the proof of possession of such images in two ways. *Gumila*, 2012 IL App (2d) 110761, ¶ 66. It can show the defendant knew he or she possessed the temporary internet files of the child pornography images. *Gumila*, 2012 IL App (2d) 110761, ¶ 66. Alternatively, it can use the temporary internet files as part of its proof the defendant possessed the images as they were displayed on the computer screen. *Gumila*, 2012 IL App (2d) 110761, ¶ 66. In the case of electronic images, acts showing dominion and control include copying, printing, and sharing images with others. See *Josephitis*, 394 Ill. App. 3d at 301 (stating evidence the defendant "had the ability to copy, print, or send the images to others," combined with evidence he intentionally procured the images, was sufficient evidence of illicit possession).

¶ 41　　　　A defendant may be convicted of possession of child pornography images based on the presence of cached temporary internet files of such images on his or her computer. See *Gumila*, 2012 IL App (2d) 110761, ¶ 66. However, the mere presence of such files is not sufficient to sustain a conviction; the defendant must know caching has occurred, or, alternatively, have viewed the relevant files longer than is necessary to terminate possession of them. See, *e.g.*, *Gumila*, 2012 IL App (2d) 110761, ¶ 66. For instance, the *Josephitis* court stated it "agree[d] with the holding in [*United States v. Kuchinski*, 469 F.3d 853, 862-63 (9th Cir. 2006)] that the *mere presence* of images or files in the [Internet] cache is not sufficient to support a finding of possession." (Emphasis added.) *Josephitis* 394 Ill. App. 3d at 306. As *Kuchinski* put it:

> "Where a defendant lacks knowledge about the cache files, and concomitantly lacks access to and control over those files, it is not proper to charge

him with possession and control of the child pornography images located in those files, without some other indication of dominion and control over the images." *Kuchinski*, 469 F.3d at 863.

Put another way, a computer user who lacks knowledge of the existence of a file also lacks the knowledge to exercise dominion and control of the file.

¶ 42　　　　The converse is not *necessarily* true. Mere knowledge of the existence of cached files—knowledge without evidence of the ability to act on the files—does not directly satisfy the requirement for dominion and control. Thus, evidence that a computer user could directly act on the cached files by copying them or deleting them is a more direct showing of dominion and control. Swartzentruber's testimony presented such evidence here.

¶ 43　　　　Although present possession of a temporary internet file is the simplest theory under which the State may prove possession, it may also prove past possession of an image even if the embodiment of that image was ephemeral. *Gumila* held the State may prove "past possession *** of the original image as it appeared to the defendant on his computer screen, and of which the TIF image is a copy." (Internal quotation marks omitted.) *Gumila*, 2012 IL App (2d) 110761, ¶ 48. However, "where the only proof of possession is that the defendant viewed the image while he had the ability (unexercised) to print it, save it, *etc.*, the defendant will have had to linger over the original image longer than necessary to terminate his possession, as by closing the Web site." *Gumila*, 2012 IL App (2d) 110761, ¶ 51. A more concrete explanation of this concept is found in *United States v. Romm*, 455 F.3d 990, 998 (9th Cir. 2006), which held, "[i]n the electronic context," nothing in the concept of possession prevents a person from "receiv[ing] and possess[ing] child pornography without downloading it." It is only necessary that he or she "seek[ ] it out and exercise[ ] dominion and control over it." *Romm*, 455 F.3d at 998. The *Romm* court held the

defendant "exercised dominion and control over the images" not because they appeared in his computer cache, but because he "enlarg[ed] them on his screen, and sav[ed] them there for five minutes before deleting them." *Romm*, 455 F.3d at 998.

¶ 44 Nevertheless, even when the State seeks to prove a defendant's prior possession of images on the screen of a computer, the existence of temporary internet files of child pornography images can provide an important part of the evidence of such possession. When the prosecution has presented evidence showing the images displayed by an Internet browser are cached as temporary internet files, the existence of such a cached file is then evidence the user viewed the image. However, if some proof of doing more than scanning past an image is required to establish dominion and control, the presence of a temporary internet file of an image is not such proof.

¶ 45 Consistent with the State's argument, *Josephitis*, states:

 "[*State v. Jensen*, 173 P.3d 1046 (Ariz. Ct. App. 2008), *Commonwealth v. Diodoro*, 2007 PA Super 256, ¶ 2 (2007)] and the *dicta* of *Scolaro* support our finding that evidence of an extensive search or paying for access and viewing images on a computer establishes both knowledge and dominion and control to support a possession finding." *Josephitis*, 394 Ill. App. 3d at 306.

¶ 46 *Diodoro* offers the clearest explanation of how the seeking out of child pornography websites is sufficient to establish dominion and control of the images found thereon. *Diodoro* explained:

 "[The defendant's] actions of operating the computer mouse, locating the Web sites, opening the sites, displaying the images on his computer screen, and then closing the sites were affirmative steps and corroborated his interest and intent to exercise influence over, and, thereby, control over the child pornography.

[Citation.] *** [Further], while [the defendant] was viewing the pornography, he had the ability to download the images, print them, copy them, or email them to others, which we find is further evidence of control." *Diodoro*, 2007 PA Super 256, ¶ 11.

¶ 47　　　　The final requirement for illicit possession of child pornography is that it be "voluntary," as defined in section 11-20.1(b)(5). 720 ILCS 5/11-20.1(b)(5) (West 2014). This provision requires not merely knowing possession, but possession "for a sufficient time [for the defendant] to be able to terminate his or her possession." 720 ILCS 5/11-20.1(b)(5) (West 2014). Under *Gumila*, to satisfy this requirement, "where the only proof of possession is that the defendant viewed the image while he had the ability (unexercised) to print it, save it, *etc.*, the defendant will have had to linger over the original image longer than necessary to terminate his possession, as by closing the Web site." *Gumila*, 2012 IL App (2d) 110761, ¶ 51.

¶ 48　　　　　　　　　　　　　　　　　5. *This Case*

¶ 49　　　　Here, the evidence is undisputed on several key issues. The images at issue depicted victims of the ages alleged by the State. Only defendant had access to his computer. The shortcuts on his computer desktop and his Internet browsing and search history showed he sought out child pornography images. Defendant does not dispute he saw the 10 images when they appeared in his browser window, so, by implication, he had "knowledge of the nature or content" (720 ILCS 5/11-20.1(a)(5) (West 2014)) of the images serving as the bases for the charges. Further, as defendant's own questioning established, he presented himself to Stephens as a knowledgeable computer user and demonstrated his knowledge by tutoring her in computer use. What remains to be established is whether the evidence adequately demonstrates (1) his possession of the images and (2) whether

defendant "knowingly procure[d] or receive[d] *** [the images] for a sufficient time to be able to terminate his *** possession." 720 ILCS 5/11-20.1(b)(5) (West 2014).

¶ 50    The State asks us to hold its burden was satisfied because "circumstantial evidence [demonstrated] that defendant knowingly and voluntarily searched for images of child pornography and did not merely encounter them inadvertently." The State's argument is correct but not complete. The two desktop shortcuts to child pornography sites are by themselves enough to show defendant deliberately sought child pornography images. However, that does not necessarily establish defendant's procurement to have been "for a sufficient time to be able to terminate *** possession." (Internal quotation marks omitted.) *Gumila*, 2012 IL App (2d) 110761, ¶ 51. A possible exception is the image found at "www dot XXX pussy teen dot com," which corresponds to State's exhibit A9; the existence of a shortcut through which defendant could view an image allows the inference he lingered over that image. Because a subscription was required to view the images, it is reasonable to conclude defendant would have had to search out the site, enter his information and method of payment, and be approved before viewing the image found.

¶ 51    There are several pieces of evidence supporting the conclusion the State established defendant's knowing possession of child pornography: (1) Swartzentruber's testimony that, with the software present on the computer, a user could access and copy temporary internet files, and someone with an equivalent knowledge of computers would be able to delete the files; (2) Stephens's testimony defendant was a knowledgeable computer user; (3) the presence of at least one known child pornography site on defendant's computer, which included a shortcut he would have had to create; and (4) the presence of a subscription-based child pornography site for which defendant would have to pay to view content.

¶ 52    Swartzentruber's testimony established the computer offered defendant the ability to exercise dominion and control over a digital file. *Josephitis* held that copying a file is a form of exercising dominion and control. *Josephitis*, 394 Ill. App. 3d at 301. And, under the traditional dominion and control standard, disposing of contraband establishes dominion and control. See *Abram*, 2016 IL App (1st) 132785, ¶ 86. Thus, when Swartzentruber testified he could easily delete temporary internet files of the type at issue, he established another way defendant had the power to exercise dominion and control. Based on the uncontested evidence, testimony defendant was a knowledgeable computer user, defendant's knowledge of how temporary files may remain on his computer, ability to create shortcuts to child pornography sites, and payment for a subscription-based site the jury was able to reasonably conclude the defendant had the requisite knowledge and possession of child pornography.

¶ 53    We note the 10 images were found in the "volume shadow copy" rather than the temporary internet files, which Swartzentruber testified was produced by timed back up software. This permits the reasonable inference the defendant did not immediately delete cached files.

¶ 54    Because the evidence was sufficient to establish defendant knowingly and voluntarily had past possession of the temporary internet files, we affirm defendant's convictions. We thus must address his remaining claims.

¶ 55                          B. Waiver of Counsel

¶ 56              1. *Facts Relating to Defendant's Waiver of Counsel*

¶ 57    When defendant was indicted in September 2017 on 13 counts of possession of child pornography in this case, two other felony cases were pending against him. The State elected to proceed first with McLean County case No. 16-CF-231, and the prosecution in the instant case began only after case No. 16-CF-231 was resolved. Defendant was arraigned in this case on

September 26, 2017. He appeared *pro se*, with Assistant Public Defender Ronald Lewis present as standby counsel in the earlier cases. The trial court noted defendant had waived counsel in the earlier cases but informed defendant his right to counsel in this case was independent of those prior decisions, as was its decision to appoint standby counsel. Defendant's comments to the court indicated he lacked confidence in Lewis. Defendant nevertheless elected to have the court appoint Lewis to represent him for the time being. The court stated it would reserve "a formal admonishment *** with respect to the potential penalties" for "a future date." Lewis filed the motion to suppress evidence at issue in this appeal.

¶ 58        Defendant filed a motion seeking to proceed *pro se* at the end of April 2018. At the motion hearing, the trial court admonished defendant to determine "whether or not [he had] the capacity to make intelligent and knowing waiver of [his] right to counsel." The court, after reading the first 10 counts of the indictment, which related to victims under the age of 13, told defendant each count was a Class 2 felony. However, because of defendant's prior convictions, each would be sentenced as a Class X felony, with a maximum sentence of 30 years' imprisonment and a minimum sentence of 6 years' imprisonment. The court told defendant the sentences were not subject to "Truth in Sentencing," so defendant could receive day-for-day credit. The sentences would be mandatorily consecutive, so the minimum aggregate sentence would be 60 years, and the maximum aggregate sentence would be 300 years. The court told defendant, if the offenses were committed as a part of a single course of conduct, the aggregate sentence would be limited to those for the two most serious felonies. The evidence would determine whether this aggregate sentence rule was applicable.

¶ 59        Concerning the remaining three charges, the trial court told defendant the standard minimum sentence for each was two years' imprisonment and the standard maximum was five

years' imprisonment. However, defendant was eligible for extended term sentences, such that the maximum sentence would be 10 years' imprisonment for each charge. The court stated these sentences were not mandatorily consecutive to any other sentences.

¶ 60        In February 2019, Joe Pioletti filed an appearance on defendant's behalf. In October 2019, Pioletti filed a motion for leave to withdraw, representing, among other things, defendant had threatened him with violence during a phone call. The trial court granted counsel's motion. In January 2020, Steven Skelton filed his appearance for defendant. In March 2021, Skelton moved for leave to withdraw, representing, among other things, defendant had not cooperated in developing a defense and had offered only "paranoid ramblings and conspiracy theories." The court granted counsel's motion.

¶ 61        In November 2021, Gigi Gilbert filed her appearance on defendant's behalf. In April 2022, Gilbert moved for the appointment of an expert to determine defendant's fitness to stand trial. The trial court granted the motion.

¶ 62        In June 2022, defendant wrote a letter to the trial court in which he "inform[ed]" it he had fired Gilbert. On August 26, 2022, Gilbert filed a motion for leave to withdraw based on defendant's desire to fire her.

¶ 63        Also on August 26, 2022, the trial court held a hearing on defendant's fitness to stand trial. At the hearing, the court accepted the expert's opinion, which noted, although defendant had great difficulty conforming to the requirements for courtroom behavior, he nevertheless was legally fit. Having found defendant fit, the court concluded it should allow defendant to discharge Gilbert.

¶ 64        Defendant indicated he did not want the trial court to reappoint Lewis to represent him. Therefore, at the State's request, the court again admonished defendant of the potential

sentences. In response to the court's questions, defendant said he was a high school graduate. He also said he spent four years at Illinois State University's College of Art. However, other statements defendant made to the court indicated his art education, although conceivably at a college level, was in the form of private lessons he received as a teenager.

¶ 65  The trial court again admonished defendant he was subject to Class X sentencing on the 10 counts relating to victims under 13. It again said all these sentences would be mandatorily consecutive. It gave defendant the same information concerning maximum and minimum sentences and the sentences for the Class 2 felonies. It did not discuss the possibility the sentences might be limited to those for the two most serious offenses. After the admonishments relating to this case, the court also discussed the possible sentences in a case, including a charge of aggravated battery to Stephens. The court warned defendant his changes of counsel had delayed the trial for years. Therefore, if he chose to waive his right to counsel at the hearing, the court would not permit him to withdraw the waiver.

¶ 66  The final pretrial hearing took place on November 10, 2022. The trial court, at the State's request, dismissed one of the Class 2 charges and one of the Class 3 charges. The State further informed the court it had concluded defendant lacked the predicate convictions for Class X sentencing. The State continued to maintain sentences for the Class 2 offenses would be mandatorily consecutive to one another. Defendant expressed surprise, saying he "would like to be admonished" because the State's conclusions resulted in "like 300 years off the possible sentence," and he complained the admonishments he received four and a half years earlier told "an entirely different story."

¶ 67  On January 20, 2023, at a hearing to determine whether defendant wished to have the public defender represent him at his sentencing hearing, the trial court readmonished defendant

concerning the potential sentences. The information the court gave defendant was essentially consistent with the previous admonishment. Defendant continued to assert his right to decline counsel.

¶ 68    At sentencing, the trial court concluded "the evidence in this case was that this was a single course of conduct without a substantial change because of the way the images were, were recovered." The court sentenced defendant to an aggregate term of 28 years' imprisonment and applied consecutive sentences only for the two most serious felonies.

¶ 69                              2. *The Arguments*

¶ 70    Defendant contends his waiver of counsel was ineffective because the trial court did not substantially comply with Illinois Supreme Court Rule 401(a)(2) (eff. July 1, 1984), which requires a defendant to be admonished of "the minimum and maximum sentence prescribed by law." He points out both times the court admonished him before trial, the sentencing information the court gave him included the incorrect statement he was subject to Class X sentencing and therefore greatly overstated both the maximum and minimum sentences. He further argues, under the circumstances, his waiver of counsel was not knowing and intelligent and was therefore invalid. See *People v. Wright*, 2017 IL 119561, ¶ 39, 91 N.E.3d 826 ("An accused may *** waive his constitutional right to counsel as long as the waiver is voluntary, knowing, and intelligent."). He states he procedurally forfeited the issue by failing to "object[ ] to the Rule 401(a) admonitions below" and by failing to "file[ ] any post-trial motion." However, he contends, because the right to counsel is fundamental, an improper admonishment prior to a waiver is reviewable as second-prong plain error.

¶ 71    The State, citing *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129 (1988), contends initially "defendant has forfeited consideration of this issue because he failed to

object at trial and failed to include this issue in a written post-trial motion." It further contends, forfeiture aside, the trial court's admonishments to defendant substantially complied with Rule 401(a), and therefore, defendant's rights under sixth amendment to the United States Constitution (U.S. Const., amend VI) were adequately protected.

¶ 72                                        3. *Forfeiture*

¶ 73        We address defendant's claim despite his failure to preserve it under the standard of *Enoch*. In *People v. Martin*, 2021 IL App (4th) 180267, ¶ 28, 183 N.E.3d 1053, a case incidentally involving an appeal by this defendant in McLean County case No. 16-CF-231, we held that because "the right to counsel is fundamental and reviewable as a substantial right [citations], we are compelled to address it under plain error regardless of defendant's failure to raise it previously." (Internal quotation marks omitted.) We apply this exception to the forfeiture rule here.

¶ 74        In any event, the rule in *Enoch*, in its classic form, cannot plausibly be applied to claims of improper admonishments. Under *Enoch*, "*[b]oth* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *Enoch*, 122 Ill. 2d at 186. We commonly speak of the rule in *Enoch* as requiring a defendant to make a contemporaneous objection to preserve a claim of error. See, *e.g.*, *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 4, 205 N.E.3d 812 ("[F]orfeiture result[s] from (1) the lack of a contemporaneous objection [or] (2) the failure to reiterate the objection in a posttrial motion."). Obviously, it is not logical to require a *pro se* defendant to contemporaneously object to admonishments intended to ensure defendants' waivers of rights are made knowingly. There may be some instances where we might reasonably expect a defendant to raise a claim of an

improper admonishment in a posttrial motion, but such a modified forfeiture rule is not the rule in *Enoch*. Therefore, we consider defendant's claim without applying *Enoch*.

¶ 75                                    4. *Rule 401(a) and the Sixth Amendment*

¶ 76          Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), an accused in a criminal proceeding has "both the right to the assistance of counsel and the correlative right to proceed without counsel." *Wright*, 2017 IL 119561, ¶ 39. Illinois makes this right effective through Rule 401. See *Wright*, 2017 IL 119561, ¶ 41 ("[C]ompliance with Rule 401(a) is required for an effective waiver of counsel."). Our supreme court does not require strict compliance with Rule 401(a) for a waiver of counsel to be valid. *Wright*, 2017 IL 119561, ¶ 41. Instead, "substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." (Internal quotation marks omitted.) *Wright*, 2017 IL 119561, ¶ 41. "Whether a trial court failed to substantially comply with Rule 401(a) admonishments is a question of law we review *de novo*." *Martin*, 2021 IL App (4th) 180267, ¶ 31.

¶ 77          When we decide whether admonishments are substantially compliant with Rule 401(a), we consider all the circumstances relating to a defendant's waiver of counsel. See *Wright*, 2017 IL 119561, ¶¶ 42-47 (reviewing cases). In other words, "[e]ach waiver of trial counsel must be assessed on the particular facts of the case." *People v. Marcum*, 2024 IL 128687, ¶ 46.

¶ 78          In *Wright*, our supreme court "considered the contours of substantial compliance with Rule 401(a)" and of the requirement the defendant receive information about maximum and minimum sentences. *Wright*, 2017 IL 119561, ¶ 42. It held the trial court substantially complied with Rule 401(a)(2) despite misadvising defendant the maximum sentence he was facing was 60 years' imprisonment, rather than the correct figure of 75 years' imprisonment. *Wright*, 2017 IL

119561, ¶ 54. The *Wright* court noted the defendant had some college education and had previously represented himself in a criminal appeal. *Wright*, 2017 IL 119561, ¶ 55. It also "[found] compelling the basis given by defendant as to why he wished to represent himself," namely, he had "speedy trial concerns." *Wright*, 2017 IL 119561, ¶ 55.

¶ 79 More recently, in *Marcum*, our supreme court addressed, as a matter of plain error, the claim of a defendant who was incorrectly told he was facing extended-term sentencing for a conviction: 7 to 14 years' imprisonment rather than 3 to 7 years imprisonment. *Marcum*, 2024 IL 128687, ¶ 45. Nevertheless, because the defendant might receive consecutive sentences for two counts in the case, the maximum aggregate sentence was 14 years' imprisonment. *Marcum*, 2024 IL 128687, ¶ 49. However, the trial court overstated the term of mandatory supervised release(MSR), telling him the MSR term could be four years to life, when the maximum was four years. *Marcum*, 2024 IL 128687, ¶ 50.

¶ 80 The defendant in *Marcum* claimed he was prejudiced by the improper admonishments. He argued that, although he found counsel ill-tempered and was unhappy with counsel's strategic decisions, he "may have been more likely to countenance" the problems had he received correct admonishments. *Marcum*, 2024 IL 128687, ¶ 51. The *Marcum* court concluded the record did not show any effect from the incorrect admonishments on the defendant's decision to represent himself. *Marcum*, 2024 IL 128687, ¶ 54.

¶ 81                                    5. *This Case*

¶ 82 Here, although the disparity between the maximum sentence defendant was told he faced and the true maximum was large—300 years versus 60 years for the Class 2 charges—the record does not indicate defendant was prejudiced. The record indicated defendant had already waived his right to counsel in the case the State elected to take to trial first. Further, the record

showed defendant failed to find acceptable private counsel after three attempts and lacked confidence in Lewis, who would have been his appointed counsel. Based on defendant's prior interactions with his attorneys, we can conclude defendant was not willing to proceed in a manner acceptable to any attorney. Thus, the mistaken admonishment did not prejudice defendant and is not a basis for reversal. See *Wright*, 2017 IL 119561, ¶ 54 (holding substantial compliance occurred where the record showed the admonishment errors had no effect on the defendant's decision to represent himself); *Marcum*, 2024 IL 128687, ¶ 54 (holding the same).

¶ 83        Defendant argues the trial court's overstatement of the maximum sentence might have led him to represent himself as a matter of desperation. We are not persuaded. To be sure, the court's overstatement of the maximum sentence was likely to negatively affect defendant's state of mind, which is reason enough for trial courts to take care not to overstate potential sentences when admonishing defendants. But defendant's response to the original admonishment was not to seek to represent himself—it was to retain counsel. He retained three attorneys after the original admonishment, apparently firing the third when she questioned his fitness. After learning of the error, he voiced no desire to suddenly seek counsel again, nor did he contend, if he had known, he would have cooperated more with counsel. In fact, when readmonished prior to sentencing, defendant repeated his desire to remain *pro se* and was impatient with the court for taking the time to readmonish him of his continued right to counsel. There is nothing in the record to support this claim, which appears for the first time on appeal.

¶ 84                        C. Defendant's Motion to Suppress

¶ 85                        1. *Facts Relevant to the Motion to Suppress*

¶ 86       The facts dispositive of defendant's claim the trial court improperly denied his motion to suppress evidence stemming from the search of a computer in Stephens's house are, for the most part, uncontested.

¶ 87       On January 14, 2016, Detective Park interviewed Stephens about possible offenses defendant committed against Stephens involving, among other things, financial exploitation. Defendant had lived with Stephens in her house, and she had used her money to buy him many items, which remained in the house.

¶ 88       Park and another detective then went to Stephens's house to photograph items she had purchased for defendant. These included welding equipment and new tools in their boxes. Park also noted boxes of expensive watches. One photograph showed what proved to be an all-in-one touchscreen computer sitting on a dresser in the guest bedroom. According to Stephens, the room was being used for storage, and it contained both men's and women's clothing. The computer did not have a keyboard with it. It had the appearance of a small television. Stephens testified the computer was one she bought for defendant in October 2014, approximately two months after he moved in with her, which he said he needed to start a landscaping business. Defendant described it as a gift. Defendant was the only one who used the computer. He had "much more computer skills" than Stephens.

¶ 89       On January 25, 2016, Park accompanied O'Donnell, an owner of Monster Pawn, and Gusek, a Monster Pawn employee, to the single-family house owned by Stephens. Gusek was deaf and limited in his ability to communicate verbally. Detective Jake Zabukovec was likely present for at least some of the time. Defendant was not present; he had been in custody since January 14, 2016. Park was aware Stephens wanted to clear her house of property associated with defendant and had invited O'Donnell, whom he trusted, to look for salable items. Stephens agreed

to the plan and went through the house with O'Donnell, pointing out items she was interested in selling. O'Donnell also identified items he was interested in buying. Park testified he remained with Stephens while O'Donnell and Gusek went through the house, coming to Stephens with questions about which items she wanted to sell. Stephens also assisted with the valuation of items. O'Donnell testified he relayed the questions through "the detectives."

¶ 90       The all-in-one computer came up in the discussion. O'Donnell learned it was one of the items Stephens wanted to sell, and he was interested in buying it. O'Donnell mentioned it could not be sold if it was locked with a password. Stephens was present and did not object to O'Donnell's implication he needed to turn on the computer to decide whether it was salable. Gusek plugged the computer into a wall outlet, and it turned on. No password was necessary to access the desktop. When Gusek saw the desktop screen, he said "this computer is bad." O'Donnell looked at the computer and called Park over. Park saw links which were "sexual in nature." Park opened a link and saw an image of "a very young female performing oral sex on a male." Park unplugged the computer and seized it. He applied for and received a warrant to search the computer. The computer was then subject to the forensic examination leading to the primary evidence at trial.

¶ 91       Defendant, represented by Lewis, filed a motion to suppress "all evidence obtained as a result of the seizure and search of Defendant's computers and electronic devices." He alleged, when the all-in-one computer was turned on, Park "searched the 'desk top' portion of the computer and examined website links." He contended he had a reasonable expectation of privacy in the electronic devices, and Park neither obtained his consent for the search nor had probable cause to search the computer. The State responded, among other things, Stephens had the authority to consent to the search of her own house and allow Park's search of the computer because she

purchased the computer, it was not password protected by defendant, and defendant was barred from returning to the house. The trial court denied defendant's motion.

¶ 92                                              2. *The Argument*

¶ 93        On appeal, defendant argues the search of the computer was without Stephens's consent. He argues no evidence exists she verbally consented to the search of the computer. Further, any nonverbal consent was too ambiguous to permit the search, which he argues was beyond the scope of the activity of O'Donnell and Gusek to which she had given consent:

> "In this case, the challenged Fourth Amendment intrusion was Detective Park's warrantless search of the computer by clicking on a link that was displayed on the computer's desktop. [Citation.] The question, then, is whether [Stephens] consented to Detective Park's search of the computer, [citation], either expressly or impliedly [citation]. Though the trial court did not address that question in its written order denying [defendant's] motion to suppress [citation], the court must have either assumed or silently found that [Stephens] had consented to the search of the computer in some manner, insofar as it engaged at some length with the subsidiary question of whether [Stephens] had actual and/or apparent authority to consent [citation]. The court thereby committed manifest error, for the state failed to carry its burden of proving by a preponderance of the evidence that [Stephens] consented to the search of the computer. [Citation.]"

¶ 94        Defendant asserts, although he failed to raise the issue in a posttrial motion, the constitutional error exception to the forfeiture rule of *Enoch* allows us to address this claim. See *Enoch*, 122 Ill. 2d at 190. The State does not suggest the issue is forfeited, and we therefore consider defendant's claim on the merits. See *People v. Whitfield*, 228 Ill. 2d 502, 509, 888 N.E.2d

- 27 -

1166, 1170 (2007) (finding the State forfeits a claim an issue asserted by the defendant was not preserved for review when it fails to argue forfeiture on appeal).

¶ 95 Here, taking the broadest view of the protections the fourth amendment grants against unreasonable searches, we cannot conclude Park opening links, under the facts of this case, fell within the fourth amendment definition of a search.

¶ 96                     3. *The Scope of Fourth Amendment Protection*

¶ 97            The fourth amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Under the United States Supreme Court's holding in *United States v. Jones*, 565 U.S. 400, 406 (2012), the fourth amendment is concerned in the first instance with government trespass upon "persons, houses, papers, and effects" (U.S. Const., amend. IV). To be sure, the landmark decision of *Katz v. United States*, 389 U.S. 347, 351 (1967), held the "Fourth Amendment protects people, not places," so "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." However, while *Katz* "established that 'property rights are not the sole measure of Fourth Amendment violations,' " it "did not 'snuf[f] out the previously recognized protection for property.' " *Jones*, 565 U.S. at 407 (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)).

> "Put another way, authority issued after *Jones* makes clear that '*Jones* establishes a default rule that a government intrusion with respect to the enumerated items of

- 28 -

the Fourth Amendment, regardless of a defendant's reasonable expectation of privacy, will implicate the constitutional protection against unreasonable searches and seizures' while '*Katz* broadens the reach of the Fourth Amendment beyond the enumerated areas to those areas where the defendant manifests a reasonable expectation of privacy.' " *United States v. Weber*, 599 F. Supp. 3d 1025, 1034 (D. Mont. 2022) (quoting *Patel v. City of Montclair*, 798 F.3d 895, 900 (9th Cir. 2015)).

¶ 98          "[P]olice activity in accessing records in a one-user single computer system is comparable to looking at records stored in a one-user filing cabinet." See 1 W. LaFave, Search and Seizure § 2.6(f) (6th ed. March 2024 update). However, the contents of a computer may or may not be protected depending on whether the relevant party has a reasonable interest of privacy in its contents. See, *e.g.*, *United States v. Pirosko*, 787 F.3d 358, 371-72 (6th Cir. 2015). The Sixth Circuit has recognized a party has a reasonable interest of privacy in a nonshared file on a computer, but not in any file shared with others. See *Pirosko*, 78 F.3d at 371-72. Similarly, courts have consistently held a party has no reasonable interest of privacy in files shared over networks between computers. See *United States v. Weast*, 811 F.3d 743, 747 n.11 (5th Cir. 2016) (so holding concerning peer-to-peer networks and reviewing cases).

¶ 99                                    4. *This Case*

¶ 100          We conclude defendant had no reasonable interest of privacy in a link to an external Internet site. Here, defendant concedes that when Stephens agreed she wanted Monster Pawn to help her sell property pertaining to defendant, she gave effective consent to O'Donnell and Gusek to check the state of the computer. See, *e.g.*, *United States v. Terry*, 915 F.3d 1141, 1144-45 (7th Cir. 2019) (stating a person with actual or apparent authority can give effective consent to a warrantless search). As defendant argues the only improper search was Park opening the links,

defendant implicitly concedes Stephens consented to one of those present plugging the computer in and turning it on. The computer was not password protected, so when Park came to examine the computer, he could view all the desktop icons. He saw several icons he identified as shortcuts to external websites. A shortcut to an external website is a link to files shared by someone else. For instance, a person could have a shortcut to the main page of the *New York Times*. Such a shortcut would be expected to lead to files shared by the newspaper. If a person cannot have a reasonable interest of privacy in a file shared on a network, *a fortiori*, he or she cannot have a reasonable interest of privacy in an unobscured link to the wider Internet. Thus, opening such links on the computer could not constitute a search under the fourth amendment.

¶ 101                                III. CONCLUSION

¶ 102          For the reasons stated, we affirm the trial court's judgment.

¶ 103          Affirmed.